# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | | |
|---|---|---|
| CORY M. REUTER, | | |
| Claimant, | ‖ | No. 19-CV-2053-LLR |
| vs. | ‖ | |
| ANDREW M. SAUL,<br>Commissioner of Social Security, | ‖ | **REPORT AND**<br>**RECOMMENDATION** |
| Defendant. | ‖ | |

_____

Plaintiff Cory M. Reuter ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85 and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I.    BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 11) and only summarize the pertinent facts here. This is an appeal from a denial of SSI and DIB. Claimant was born on July 20, 1979. (AR[1] 270.) Claimant is a high school graduate.

_____

[1] "AR" cites refer to pages in the Administrative Record.

1

(*Id.* at 297.)  He allegedly became disabled due to back problems, sleep apnea, high blood pressure, obesity, heart issues, and social anxiety.  (*Id.* at 296.)  Claimant's onset of disability date was April 21, 2016.  (*Id.* at 264, 270.)  Claimant filed an application for SSI on April 21, 2016.  (*Id.* at 45, 264.)  He also filed an application for DIB on April 21, 2016.  (*Id.* at 45, 270.)  His claims were denied originally and on reconsideration.  (*Id.* at 178-86, 194-205.)  A video hearing was held on August 23, 2018 with Claimant and his attorney, Hugh Field, in Waterloo, Iowa and ALJ Tom Andrews in West Des Moines, Iowa.  (*Id.* at 67-113.)  Vocational Expert ("VE") Vanessa J. May appeared by telephone.  (*Id.* at 67.)  Claimant and the VE testified.  (*Id.* at 74-112.)  The ALJ issued an unfavorable decision on December 5, 2018.  (*Id.* at 45-58.)

Claimant requested review and the Appeals Council denied review on January 22, 2019.  (*Id.* at 1-5.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481.

On July 31, 2019, Claimant timely filed his complaint in this Court.  (Doc. 4.) On March 6, 2020, all briefing was completed.  On March 9, 2020, the Honorable Linda R. Reade referred the case to me for a Report and Recommendation.

## II.  DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant

2

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

3

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id*. (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience.

*Id.* §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.      *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his alleged onset of disability date. (AR at 47.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: obesity, hypertension, obstructive sleep apnea, non-ischemic cardiomyopathy with lower extremity edema, degenerative disc disease, anxiety, and depression. (*Id.*) The ALJ found Claimant's pancreatitis and pneumonia to be nonsevere impairments. (*Id.* at 48.) The ALJ evaluated Claimant's claims under listings 1.04A (disorders of the spine with evidence of nerve root compression), 4.02 (chronic heart failure while on a regimen of prescribed treatment); 4.04 (ischemic heart disease, with symptoms due to myocardial ischemia) 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive compulsive disorders). (*Id.* at 49.) When crafting the RFC, the ALJ also considered the effects of Claimant's obesity on his impairments. (*Id.* at 53.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.* at 48.)

At step four, the ALJ found that Claimant had the following RFC:

[C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he cannot climb ladders, ropes, or scaffolds, and he must avoid even moderate exposure to hazards, such as unprotected height/elevations or dangerous/unguarded

5

moving machinery/parts. Additionally, he may have no more than occasional contact with the public, co-workers, and supervisors, and his work must deal largely with things, rather than people. Moreover, the claimant may engage only in routine, repetitive work tasks, with no more than occasional changes in the general nature of the work setting or tasks performed. Finally, the claimant can work at no more than a regular pace.

(*Id.* at 49-50.)  The ALJ further found Claimant was unable to perform any of his past relevant work.  (*Id.* at 56.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform, including retail marker, laundry worker, and cleaner.  (*Id.* at 57.)  Therefore, the ALJ concluded that Claimant was not disabled.  (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole."  *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case.  *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision is not outside that zone of choice simply because the court might have reached a different decision.  *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

6

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.   DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to include his treating cardiologist's limitations of "off-task 5 percent of the workday" and "absent once per month" in the RFC and (B) failing to provide good reasons for the weight afforded to the examining medical source opinion of Mr. James Johnson. Claimant further argues the ALJ was not appointed in a constitutional manner. Thus, he argues the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

### A.   The ALJ properly declined to include "off-task 5 percent of the workday" and "absent once-per-month" limitations in the RFC.

Dr. Linda Cadaret is Claimant's treating cardiologist. Dr. Cadaret completed a checkbox opinion form on October 4, 2017. (AR at 1279-82.) She has been treating Claimant since February 2017 and sees Claimant every three-to-four months or as clinically indicated. (*Id.* at 1279.) She diagnosed Claimant with nonischemic cardiomyopathy NYHA Class II with the following symptoms: chronic fatigue and exertional dyspnea (shortness of breath). (*Id.*) Claimant's prognosis is good. (*Id.*) Dr. Cadaret noted that Claimant became fatigued after a full day's work, but stated he was

capable of low stress work per his functional evaluation. (*Id.* at 1280.) Dr. Cadaret directed the reader to Claimant's functional evaluation for information regarding Claimant's functional limitations in a competitive work situation. (*Id.*) Dr. Cadaret stated, "We can only comment on what was evaluated during functional eval." (*Id.* at 1282.) She estimated Claimant's symptoms would be severe enough to interfere with attention and concentration needed to perform work tasks five percent of the time and that he would likely miss full-time work about one day per month due to his impairment. (*Id.*)

The function report that Dr. Cadaret referred to will be discussed in detail below, but some context is necessary here. Mr. James Johnson conducted an Iowa CHAMPS[2] functional evaluation/treadmill evaluation with lifting assessment of Claimant on September 19, 2017. (*Id.* at 1283-89.) Although ARNP Shelly McGurk supervised the treadmill stress test portion of the examination, Mr. Johnson incorporated Ms. McGurk's notes into his report. (*Id.* at 1284-85, 1288.) In pertinent part, the evaluation provides that Claimant is not able to continue working in road construction or brick laying, his previous occupations, but that he can "tolerate a less physical position that would require 5.0 METs or less with brief periods of 7.5 METs and also allow a good balance between standing and sitting throughout the day."[3] (*Id.* at 1285-86.) Mr. Johnson provided the

---

[2] The parties do not explain what CHAMPS stands for. It seems to be an abbreviation for "Cardiovascular Health, Assessment, Management, and Prevention Services." *See* Health at Iowa, *Heart patient fights like a champ*, https://medcom.uiowa.edu/health/heart-patient-fights-like-a-champ/; AR at 1283 (Mr. Johnson noted that the following were ordered to be performed at the University of Iowa Hospitals and Clinics, "CHAMPS—PROCEDURE LIFTING ASSESSMENT/TREADMILL EVALUATION.").

[3] "One metabolic equivalent (MET) is defined as the amount of oxygen consumed while sitting at rest and is equal to 3.5 ml O2 per kg body weight x min. The MET concept represents a simple, practical, and easily understood procedure for expressing the energy cost of physical activities as a multiple of the resting metabolic rate." Jetté, M., Sidney, K., Blümchen, G., *Metabolic Equivalents (METS) in Exercise Testing, Exercise Prescription, and Evaluation of*

following non-exhaustive list of jobs as examples of appropriate jobs that were appropriate for Claimant:

- Custodial activities;
- Landscaping;
- Home repair;
- Telecommunications;
- Clerical or office activities;
- Computer activities;
- Driving shuttle vehicle; [and]
- Standing performing assembly or repair.

(AR at 1286 (punctuation added).)

### 1. The ALJ's Assessment of the Opinion

The ALJ evaluated Dr. Cadaret's opinion and noted that Dr. Cadaret referred to the functional evaluation "to explain that opinion, and that evaluation indicated the claimant retains the ability to perform sustained work that requires no more than 5.0 METs. (*Id.* at 55.)

> This in turn indicates Dr. Cadaret meant to suggest the claimant could not perform a full day's work in the type of construction job he used to have— not all work in general. Lastly, Dr. Cadaret noted the claimant would be off task five percent of the workday and be absence [sic] once per month. Given the previously referenced implication of the claimant's functional capacity exam results and his daily activities, as well as the improvement in his heart function, the undersigned gives these opinions significant weight.

(*Id.*)

### 2. The Parties' Arguments

Claimant argues that because the ALJ gave Dr. Cadaret's opinion significant weight, he should have included in the RFC her limitations that Claimant would be off

---

*Functional Capacity*, Aug. 1990 Clin. Cardiol., at 555-65, Nat'l Ctr. for Biotech. Info., U.S. Nat'l Lib. Med, NIH, https://www.ncbi.nlm.nih.gov/pubmed/2204507 (quoting abstract).

9

task five percent of the time and would miss work one-day-per-month. (Doc. 13 at 5.) Claimant avers that because "the decision indicates that the ALJ actually meant to include such limitations in [the] RFC, remand is required for the ALJ to correct this 'good reasons' error." (*Id.* (citing *Gann v. Berryhill*, 864 F.3d 947, 952-53 (8th Cir. 2017).) Claimant argues that because the hypothetical questions proffered to the VE did not contain all the limitations they should have, the step five denial of benefits was based on a VE testimony that "cannot be viewed as substantial evidence that [Claimant] could perform other work in the national economy." (*Id.* at 6.)

The Commissioner responds that "[n]othing in the ALJ's decision supports [Claimant's] position." (Doc. 15 at 7.) The Commissioner argues that Mr. Johnson's functional evaluation focused on testing Claimant's "ability to perform the functions of his past work, which Mr. Johnson identified as road construction and brick layer" and states that "Dr. Cadaret's opinion appears to mirror and adopt the functional evaluation, as the doctor specifically stated, 'We can only comment on what was evaluated during functional eval[uation].'" (*Id.* (brackets in original)).

Claimant counters that this argument amounts to a "*Chenery* doctrine violation-style argument often seen in these cases." (Doc. 16 at 2 (citing *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014)). For the reasons stated in the analysis, below, I do not agree. The ALJ was required to base his decision on the record as a whole, including all of Dr. Cadaret's opinion and the function report she referred to in that opinion.

### 3. *Analysis*

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

10

For support, Claimant cites *Gann v. Berryhill*, 864 F.3d 947, 952-53 (8th Cir. 2017). In *Gann*, the hypothetical upon which the ALJ based the claimant's ability to do work in the national economy did not contain limitations contained in physicians' opinions that the ALJ gave significant weight. 864 F.3d at 952-53. Because the hypothetical did not contain all the claimant's limitations, the VE's testimony did not constitute substantial evidence that the claimant could perform certain work. *Id.* at 953.

The question here becomes whether Dr. Cadaret's opinion contained the limitations of being off task five percent of the day and being absent one-day-per-month for all jobs or only for Claimant's past work as a brick layer and construction worker. The ALJ's language on this point was unclear:

> [W]hile she indicated [Claimant] becomes fatigued with a full day's work, she also referred to the previously cited functional evaluation to explain that opinion, and that evaluation indicated that the claimant retains the ability to perform sustained work that requires no more than 5.0 METs. This in turn indicates Dr. Cadaret meant to suggest the claimant could not perform a full day's work in the type of construction job he used to have—not all work in general. *Lastly, Dr. Cadaret noted the claimant would be off task five percent of the workday and be absence [sic] once per month.* Given the previously referenced implication of the claimant's functional capacity exam results and his daily activities, as well as the improvement in his heart function, the undersigned gives these opinions significant weight.

(AR at 55 (internal citations omitted; emphasis added).)

Standing alone, it is apparent how one could think the highlighted portion of this paragraph is not related to the parts of the discussion referring to Claimant's past work. However, Dr. Cadaret stated in her opinion that she could only comment on what was evaluated during the functional evaluation. (*Id.* at 1282.) Unlike functional evaluations done by consulting examiners for SSA that are designed to see what jobs claimants are qualified to perform, this evaluation was designed to see if Claimant could return to his previous work. (*Id.* at 1283 ("Return to work assessment"); 1284 ("Regular duty at

11

patient's most recent job required lifting and carrying. Therefore, a lifting assessment was conducted."); 1287 ("Return to work assessment")). While Mr. Johnson suggested other jobs that Claimant could perform, the focus of the evaluation was Claimant's fitness to work as a brick layer or road construction worker. Therefore, the limitations at issue referred to limitations Claimant would have while working in his previous occupations, not limitations he would have in any job. This makes practical sense because the jobs Mr. Johnson suggested for Claimant's future occupations involve differing levels of physical exertion. For example, one of the jobs Mr. Johnson suggested was landscaper. Landscape gardener with an alternate title of landscaper has a heavy strength level in the *Dictionary of Occupational Titles* (*DOT*).[4] https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT04A.HTM. "Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. § 404.1567(d). On the other hand, data entry clerk (clerical) with the alternate title data entry operator, which could satisfy both Mr. Johnson's computer activities and clerical office jobs, has a sedentary strength level in the *DOT*. https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT02A.HTM. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).

With Dr. Cadaret's caveat that her opinion was limited to what was evaluated in the functional evaluation, the ALJ's failure to include these limitations is supported by the record on the whole. More importantly, the ALJ referred to the "previously referenced implications of the claimant's functional capacity exam results and his daily activities, as well as the improvements in his heart function." (AR at 55.) The ALJ

_____

[4] Although Mr. Johnson was not using the *DOT* as a resource (AR 1286 (citing *The Compendium of Physical Activities Tracking Guide*)), it is the resource used by SSA, and contains listings that correspond to many of the jobs cited by Mr. Johnson.

12

discussed the functional evaluation and concluded that the evaluation along with other evidence in the record supported his conclusion.

> With the implications of the claimant's daily activities, the undersigned finds the claimant's treadmill and lifting test results consistent with the ability to perform a reduced range of light exertion, despite his cardiomyopathy, spinal degeneration, and hypertension. After all, in addition to his demonstrated exercise tolerance, the claimant's function report confirms he continues to live alone and independently, with the ability to perform light household chores such as laundry, prepare daily meals, drive, shop for groceries, go fishing occasionally, and visit friends several times per week. These tasks, when considered with the previously described exam and test results, provide strong evidence that the claimant's cardiomyopathy would not preclude the work described in the above-listed residual functional capacity assessment.

(*Id.* at 52.)

Furthermore, nothing in Dr. Cadaret's treatment notes supports the conclusion that Claimant would be off task five percent of the workday and be absent once per month. *See* 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion.") "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937.

Claimant first presented to Dr. Cadaret on February 20, 2017 for evaluation and management of his non-ischemic cardiomyopathy. (AR at 1245.) Claimant complained he was short of breath after climbing one-to-two flights of stairs. (*Id.*) Although he did not have much peripheral edema, he did have some abdominal bloating. (*Id.*) He denied exertional chest pain, lightheadedness, or dizziness, and had never passed out. (*Id.*) He reported "weakly [sic] palpitations" that occurred when he got excited. (*Id.*) He was not on a low-sodium diet and was responding well to Lasix. (*Id.*) Dr. Cadaret changed Claimant's beta blocker prescription, ordered a cardiac MRI, referred Claimant to cardiac

13

rehabilitation to increase his exercise tolerance, and gave him an exercise prescription. (*Id.* at 1250.)

By March 23, 2017, Claimant was feeling well and denied any chest pain, light headedness, or dizziness; could walk a block; was "working" on a treadmill 30 minutes-a-day; and was responding well to Lasix. (*Id.* at 1256.) He was not on a low-sodium diet. (*Id.*) Dr. Cadaret noted that Claimant was doing well and had good functional capacity. (*Id.* at 1261.) She encouraged Claimant to lose weight and follow a salt-free diet. (*Id.*) He continued to improve in May 2017. (*Id.* at 1266.) He continued to deny any problems and continued exercising. (*Id.*) He was doing well, had good functional capacity, had almost doubled his MET level, and had lost ten pounds. (*Id.* at 1267.) Dr. Cadaret encouraged him to keep losing weight and to follow a low-sodium diet. (*Id.*)

On June 19, 2017, Claimant again reported that he was feeling well and denied any chest pain, light headedness, or dizziness; could walk a block; was working on a treadmill 30 minutes-a-day; and was responding well to Lasix. (*Id.* at 1268.) He still was not on a low-sodium diet. (*Id.*) Claimant had been hospitalized with very low blood pressure since his last appointment with Dr. Cadaret, and inquired "if methamphetamine could have caused his problems as he used Meth shortly prior to his hospitalization." (*Id.*) In spite of this, Dr. Cadaret still found that Claimant was doing well at his appointment and had good functional capacity. (*Id.* at 1272.) She continued to encourage Claimant to lose weight, follow a low-sodium diet, and stressed the importance of "absolute abstinence" from meth because even using occasionally could lead to a lethal MI or dysrhythmia. (*Id.*)

On September 12. 2017, Claimant returned to Dr. Cadaret and once again reported that he was feeling well and denied any chest pain, light headedness, or dizziness; could walk a block; was working on a treadmill 30 minutes-a-day; and was responding well to Lasix. (*Id.* at 1273.) He was not compliant with his CPAP. (*Id.*) Dr. Cadaret again

14

noted that Claimant was doing well and had good functional capacity. (*Id.* 1277.) She repeated her admonitions regarding diet, exercise, and methamphetamine use from June.[5] (*Id.* at 1277-78.) Throughout these treatment notes, Dr. Cadaret documented various medication changes and modifications. (*Id.* at 1245-78.)

Nothing in these treatment notes supports a finding of limited ability to work or any indication that Claimant would be off-task. Dr. Cadaret's assessments consistently stated that Claimant was doing well and had good functional capacity. Claimant was compliant with his exercise program and was making progress with weight loss and with increasing his METs. Although Dr. Cadaret explained the need for a functional assessment before she could write her opinion, that was policy. (*Id.* at 1273.) This does not change the fact that her notes do not support a finding that Claimant would be off task five percent of the workday and be absent once per month. There is not even a notation that Claimant was late for any appointment or that Claimant's symptoms caused him to cut short activities.

Likewise, as the ALJ noted, the record supports the conclusion that Claimant can perform work at the light exertional level without being off task five percent of each day and missing work one day a month. There is nothing in the record as a whole that supports an interpretation of Dr. Cadaret's opinion to show that Claimant's physical impairments would cause him to be off task five percent of the workday or absent once-per-month. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion.")[6] As the ALJ noted, a mid-September 2017 echocardiogram showed that

---

[5] Claimant testified that he tries to stay away from alcohol and drugs by fishing and hanging out with his family and that his hospitalization was a "wakeup call." (AR at 87, 90.)

[6] Claimant testified that he has anxiety and panic attacks and told SSA in his function report he had a hard time remembering things and got anxious. (AR at 78-80, 100-01, 338-39.) However, Claimant has not appealed the ALJ's decisions related to his mental impairments.

15

Claimant's left ventricular function had improved into the normal range. (AR at 51, 1295.) As previously discussed, Claimant's stress test resulted in no exercise-induced ischemia. (*Id.* at 51, 1284.) Moreover, Claimant's lifting assessment, "during which he performed 10 repetitions of 25-pound dumbbell lifts with his right arm, rested two minutes, then performed eight repetitions of lifting a 50-pound crate from a table and transferred it 10 feet to another table" resulted in no complications. (*Id.* at 52, 1285.) Therefore, the functional assessment does not support a finding that Claimant would be off-task five percent of the day and would miss work one-day-a-month.

Additionally, Claimant's daily activities supported the ALJ's determination that Claimant could engage in a full range of light work with the noted limitations without further limiting Claimant to being off task five percent of the day and missing work one-day-a-month. In relevant part, Claimant cooks simple meals, "go[es] fishing a lot," goes to "a lot of movies," helps his mother with her lawn, can walk two blocks before starting to breathe heavily, lives independently, shops for groceries, and does light household chores. (*Id.* at 52, 86-87, 97-98, 104, 112, 333-34.)

In short, I find that Dr. Cadaret did not include a limitation in her opinion that Claimant would be off task five percent of the day and would miss work one-day-a-month for all work. In the alternative, if Dr. Cadaret did include such a limitation, I find that the ALJ was justified in ignoring it because the limitation was not supported by substantial evidence on the record as a whole.[7]

--------

[7] If the District Court finds that Dr. Cadaret included the limitations, I find that the remaining 20 C.F.R. Section 404.1527(c)(2) factors weigh in favor of giving the limitations significant weight only as they relate to Claimant's past work. (1) Length of the treatment relationship and the frequency of examination: Dr. Cadaret is Claimant's treating cardiologist and saw Claimant five times between February and September 2017. Claimant indicated in testimony that he continues to see Dr. Cadaret (AR at 76), but these are the only records in the file. (2) Nature and extent of the treatment relationship: Dr. Cadaret monitors all aspects of Claimant's cardiac care, including referrals for exercise other therapies. (5) Specialization: Dr. Cadaret is a

I find the ALJ's decision supported by the record as a whole and recommend affirming the ALJ's decision on this issue.

**B.    *The ALJ provided good reasons for the weight afforded to the opinion of examining medical source James Johnson and properly omitted a sitting/standing limitation in the RFC.***

As discussed above, James Johnson conducted a functional evaluation/treadmill evaluation with lifting assessment of Claimant on September 19, 2017.  (*Id.* at 1283-89.) There is no indication in the record regarding Mr. Johnson's level of training, education, certification, or experience.  (*Id.*)  Mr. Johnson incorporated Ms. McGurk's treadmill stress test notes into his report.  (*Id.* at 1284-85, 1288.)  Mr. Johnson noted that during the stress test, Claimant experienced "shortness of breath and fatigue" at peak exercise and the test was terminated due to "limiting fatigue."  (*Id.* at 1284.)  Claimant's EKG showed ST depressions at peak exercise and returned to normal baseline seven minutes into recovery.  (*Id.*)  However, there were frequent PVCs[8] noted during exercise.  (*Id.*) Claimant "tolerat[ed] the procedure well and no complications were noted."  (*Id.*) Although there were "significant arrhythmias noted, there were no significant EKG changes and Claimant's blood pressure response was appropriate.  (*Id.*)  Claimant's

---

cardiologist who wrote an opinion about a patient in her area of expertise.  However, based on the weight of the evidence of the Supportability and Consistency factors discussed above, I find that if Dr. Cadaret's opinion contains a limitation to being off task five percent of the day and missing work one-day-per-month for all work, that opinion is not supported by the record as a whole.

[8] "Premature ventricular contractions (PVCs) are extra heartbeats that begin in one of [the] heart's two lower pumping chambers (ventricles). These extra beats disrupt [the] regular heart rhythm, sometimes causing [a person] to feel a fluttering or a skipped beat in [his or her] chest. Premature ventricular contractions are common — they occur in many people."  Mayo Clinic, *Premature ventricular contractions (PVCs)*, https://www.mayoclinic.org/diseases-conditions/premature-ventricular-contractions/symptoms-causes/syc-20376757.

exercise tolerance was negative for exercise-induced ischemia[9] at 82% MPHR.[10] Claimant's exercise tolerance was 10.1 METs, while age-predicted tolerance was 12.3 METs.

During his lifting assessment, Claimant "lifted [a] flat crate weighing 50 lbs. from a table waist high and transferred it 10 feet to another table waist high. He paused 2 seconds and then repeated the action. He performed 8 repetitions. (6.5 METs)." (AR at 1285.) Claimant stated his shortness of breath was 4/10 when doing this assessment. (*Id.*)

Mr. Johnson stated that Claimant's most recent jobs were in road construction and brick laying and that Claimant worked 10-12 hours-a-day. (*Id.*) The energy required to perform these jobs was 3.0 to 9.0 METs. (*Id.*) He estimated that Claimant's ability was "10.1 METs (fair tolerance to exercise) [and that the] Age predicted exercise tolerance [was] 12.3 METs." (*Id.*)

Based on the assessment, Mr. Johnson opined that an occupational level of 5.0 METs would be the maximum Claimant would be able to tolerate for several hours and that a maximum of 7.5 METs would likely be tolerated for short periods—a few minutes or less. (*Id.*) He further opined that Claimant would not be able to continue working in road construction or brick laying, but that he could "tolerate a less physical position that would require 5.0 METs or less with brief periods of 7.5 METs and also allow a good balance between standing and sitting throughout the day." (*Id.* at 1285-86.) Mr. Johnson then provided the aforementioned non-exhaustive list occupations that could be

---

[9] Ischemia is a "deficient supply of blood to a body part (such as the heart or brain) that is due to obstruction of the inflow of arterial blood." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ischemia.

[10] MPRH is an acronym for "maximum predicted heart rate." Medical Abbreviations, MPHR, http://www.medicabbreviations.com/search2.php.

considered at the appropriate MET level. (*Id.* at 1286.)  Mr. Johnson provided the following summary of his assessment:

> The results of this test indicate that Mr. Reuter has a fair exercise tolerance. Therefore, he does not have the functional capacity to return/continue his most recent occupation of road construction at full capacity within the above stated MET levels and lifting/carrying requirements.  The patient could tolerate a less physical position that would require 5.0 METs or less and allow for a good balance between standing and sitting throughout the day.

(*Id.*)

### 1.    *The Parties' Arguments*

Claimant argues that the ALJ did not discuss what weight he assigned to Mr. Johnson's opinion.   (Doc. 13 at 7.)   He asserts that the ALJ did not discuss "inconsistencies with the testing results and recommendations" and that "the ALJ seemed to think the testing results warranted adoption in [Claimant's] RFC."   (*Id.*)  Claimant specifically takes issue with the ALJ's failure to include a "good balance between standing and sitting" limitation in the RFC.  He argues the following:

> The ALJ recognized Mr. Johnson recommend a good balance between standing and sitting throughout the day based on his testing. . . . The ALJ's discussion of Dr. Cadaret's opinions, which the ALJ recognized were relying on Mr. Johnson's testing and report to some degree, indicates the ALJ meant to afford these opinions concerning alternating sitting and standing significant weight. The RFC does not include any limitation on standing or walking—it is a generic light exertional level RFC as it relates to standing and walking limitations.

(*Id.*)

Claimant recognizes that while the ALJ need not explain the weight afforded to other medical source opinions with as much precision as that used to explain the weight afforded to acceptable medical source opinions, "the ALJ must still identify some inconsistency between the other source's opinions and the record." (*Id.*)  Claimant argues that Dr. Cadaret adopted Mr. Johnson's opinions regarding "work allowing a good

balance between standing and sitting throughout the day" and "because the ALJ afforded Dr. Cadaret's opinions significant weight, remand is required for the same reasons discussed in the prior argument concerning Dr. Cadaret's opinions concerning off task and absences limitations." (*Id.*)

The Commissioner responds that not only did the ALJ properly interpret Mr. Johnson's functional evaluation as supporting Claimant's ability to perform work at the light exertional level, the ALJ did not need to explain the weight he gave to Mr. Johnson's opinion because Mr. Johnson is not an acceptable medical source and the opinion had no effect on the outcome of the case. (Doc. 15 at 8 (citing 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).) The Commissioner further argues that the ALJ did not have to explain the weight given to the opinion even if the opinion had an effect on the outcome of the case. (*Id.* at n.4 (citing 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).)

### 2. *Analysis*

Mr. Johnson signed his functional evaluation "James Johnson CHAMPS," which gives the reader no idea about his qualifications. (AR at 1286.) The Commissioner assumed Mr. Johnson was "not an acceptable medical source" and Claimant did not take issue with that assumption. (Doc. 16 at 2.) I agree that Mr. Johnson is a medical source who is not an acceptable medical source under SSR 06-03P.

> The adjudicator generally should explain the weight given to opinions from [medical sources who are not acceptable medical sources] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

20 C.F.R. § 404.1527(f)(2).

In this case, the ALJ did not specifically discuss Mr. Johnson's assessment and assign weight (i.e., little, great, significant, etc.) to the assessment. I find the ALJ did,

however, "ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.*

In reaching his decision that Claimant was able to engage in a range of light work with certain limitations, the ALJ relied on the tests Mr. Johnson administered: "[U]pon performance of a stress test . . . electrocardiogram (EKG) monitoring registered no significant changes, [Claimant's] blood pressure remained appropriate, and he achieved an exercise tolerance of 10.1 METs. The interpreting clinician noted these results indicated no exercise induced ischemia." (AR at 51 (internal citations omitted).) The ALJ also noted that Mr. Johnson administered a lifting test to Claimant and found "no complications limiting the claimant's lifting performance." (*Id.* at 52.) The ALJ continued,

> As such, and in consideration of the claimant's treadmill test and echocardiogram results, that source, James Johnson, opined the claimant could not sustain the exertional requirements of his past work in road construction and brick laying. However, Mr. Johnson then wrote,
>
> > [The claimant] could, however, tolerate a less physical position that would require 5.0 METs or less with brief periods of 7.5 METs and also allow a good balance between standing and sitting throughout the day.
>
> Mr. Johnson went on to list several activities that would be consistent with that capacity, including landscaping, custodial services, and standing while performing assembly or repair tasks.

(*Id.* (internal citations omitted; spacing in original).) The ALJ continued, "With the implications of the claimant's daily activities, the undersigned finds the claimant's treadmill and lifting test results consistent with the ability to perform a reduced range of light exertion. . . . These [daily activities], when considered with the previously described exam and test results, provide strong evidence that the claimant's

cardiomyopathy would not preclude the work described in the above-cited residual functional capacity assessment." (*Id.*)

The ALJ again mentioned Mr. Johnson's assessment when contemplating the effect Claimant's obesity has on his RFC. (*Id.* at 53-53 ("[G]iven the claimant's activities of daily living and the previously referenced exercise test results, the undersigned finds the [RFC] assessment already accounts for any additional limitations his obesity may cause.").) The ALJ also relied on Mr. Johnson's assessment when evaluating the opinions of the state agency medical consultants. (*Id.* at 54.) The ALJ gave their opinions great weight, in part, because "a treadmill stress test performed through the claimant's cardiologist showed he could perform exertional consistent with tasks like landscaping, standing while assembling, or custodial services." (*Id.*) In addition, the ALJ also relied, in part, on the results of Claimant's "exercise stress test" to find that while Claimant's mother's third-party function report was supportive of Claimant's application for benefits, it warranted no restrictions beyond those listed in the RFC. (*Id.* at 56.)

This ubiquitous use of Mr. Johnson's assessment to support his decision can lead to no other conclusion but that the ALJ relied on the assessment to support his decision. The decision is well-written and "allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." 20 C.F.R. § 404.1527(f)(2). The ALJ discussed Mr. Johnson's assessment on AR 51-52 and explained why the assessment supported the RFC. After that, the ALJ referred to the assessment multiple times to support other conclusions. (AR 52-56.) The ALJ explained the significance of the tests to which he referred. (*Id.*) While a reader of Social Security disability decisions is used to seeing weights assigned to opinions, 20 C.F.R. § 404.1527(f)(2) makes it clear that assignment of a weight is not required when the opinion writer is not an acceptable medical source. The fault, if any, is merely in writing-style, not in legal reasoning, and does not provide the basis for remand. *See Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) ("[T]he ALJ's

arguable deficiency in opinion-writing technique had no bearing on the outcome of [the] case and does not require remand.") (internal quotation omitted).

The next question is whether the RFC was required to include the following language from Mr. Johnson's assessment: "allow a good balance between standing and sitting throughout the day." (AR at 1286.) Claimant argues that because the ALJ relied so heavily on Mr. Johnson's assessment, he was required to include this language in the RFC. The Commissioner responds that "[t]he ALJ interpreted Mr. Johnson's opinion as addressing the intensity level of activities [Claimant] could sustain, rather than being a requirement of a sit/stand option." (Doc. 15 at 9-10.)

The ALJ found that Claimant can perform light work with certain limitations that do not pertain to standing or sitting. (AR at 49-50.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). As discussed above, the jobs suggested by Mr. Johnson do not all fall into one *DOT* category because Mr. Johnson was not performing an SSA assessment. (AR at 1286 (citing *The Compendium of Physical Activities Tracking Guide*).) However, it is not hard to imagine that a shuttle vehicle driver and a standing assembly line worker would have different opportunities to balance sitting and standing throughout the day, although Mr. Johnson found both those jobs were appropriate jobs for Claimant. (AR at 1286.) The same can be said for a landscaper and someone who performs "computer activities." (*Id.*) Thus, when read in context, it appears Mr. Johnson's recommendation is not a "sit/stand" option, as the Commissioner asserts, but rather the option to move at some point during the day.

Someone on a standing assembly line must be at his assigned post during his shift and likely cannot leave at will or the entire assembly line will. Likewise, someone who drives a shuttle vehicle cannot pull the shuttle over to take unscheduled breaks to stand and/or walk at will because the shuttle must stay on schedule. Therefore, when read in context, Mr. Johnson was not stating that Claimant could only perform jobs where he could shift between sitting and standing at will. Rather, it seems he was recommending that Claimant have a job that allows him more opportunities for sitting than laying brick or building roads, but not necessarily a job that allows Claimant to do so whenever he wants.

Light work conforms with Mr. Johnson's recommendation because workers at this level must be able to do "a good deal of walking or standing" and also perform jobs that involve sitting most of the time. This is opposed to a sedentary job, which "is defined as one which involves sitting. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). Medium, heavy, and very heavy work designations contain no walking and sitting limitations. 20 C.F.R. § 404.1567(c)-(e).

Therefore, I find that while the ALJ relied on Mr. Johnson's assessment, the ALJ properly accounted for Mr. Johnson's "good balance between sitting and standing throughout the day" recommendation by limiting Claimant to light work with certain further restrictions. Moreover, one of the jobs the ALJ relied on to find there were jobs in the national economy that Claimant could perform was cleaner, which is equivalent to custodian on Mr. Johnson's list of suggested jobs that Claimant can perform. (*Id.* at 57, 1286.) There are 290,000 cleaner jobs in the national economy, which is a significant number of jobs. *See Weiler v. Apfel*, 179 F.3d 1107, 1111 (8th Cir. 1999) (32,000 jobs in the national economy was a significant number of jobs). Therefore, even if the District Court disagrees with my interpretation of Mr. Johnson's assessment, remand is not

required because the number of cleaner jobs, alone, not only complies with Mr. Johnson's requirements, but also provides a significant number of jobs in the national economy, which should satisfy Claimant, who wanted the ALJ to adopt Mr. Johnson's recommendations in total.

Based on the record as a whole and based on the above discussion, I recommend the District Court affirm the ALJ's decision on this issue. *See Hacker*, 459 F.3d at 936 (ALJ's decision is not outside acceptable zone of choice simply because the court might have reached a different decision).

**C.    *The ALJ was appointed in a constitutional manner.***

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 13 at 9.) Claimant asserts this Court should vacate the denial of benefits by ALJ Andrews and remand the case for decision by what he contends is a properly-appointed ALJ. (*Id*. at 8.)

Claimant presented his Appointments Clause challenge to the Appeals Council. (*Id*. at 1, 378.) Therefore, forfeiture is not an issue in this case.

However, on July 16, 2018, while Claimant's case was in the administrative process, then-Acting Commissioner of Social Security Nancy Berryhill ratified the appointments of all Social Security ALJs. (Doc. 13 at 9.) Claimant argues that Ms. Berryhill had no power to appoint the ALJs because "the Federal Vacancies Reform Act as it relates to temporary Department Heads may only be constitutional as it relates to temporary appointments, since a principal officer requires Senate confirmation." (*Id*. at 10 n. at 8 (citing *United States v. Eaton*, 169 U.S. 331, 343 (1898).) Claimant argues

25

that Ms. Berryhill was an inferior officer who did not have the power to appoint other inferior officers, in this case, ALJs. (*Id.* at 10-11; Doc. 16 at 2-3.)

The Commissioner argues that there is nothing in any case Claimant cites that "could be read to call into question the authority of an acting officer to exercise the powers of the vacant office." (Doc. 15 at 12.) The Commissioner further argues that there is "a long history of acting officials serving as Department Heads and exercising the powers of their offices." (*Id.* at 12-13 (citing Office of Legal Counsel, DOJ, *Designating an Acting Attorney General*, at 2 (Nov. 14, 2018) https://www.justice.gov/olc/file/1112251/download ("As all three branches of government have long recognized, the President may designate an acting official to *perform the duties of a vacant principal office*, including a Cabinet office, even when the acting official has not been confirmed by the Senate.") (emphasis added); *id.* at 8-28 (surveying this history).)

The Federal Vacancies Reform Act ("FVRA") provides the following:

(a) If an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--

(1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity . . . .;

(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity. . .; or

(3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity. . . .

26

5 U.S.C. § 3345. Thus, a plain reading of the Act gave Acting Commissioner Berryhill the authority to appoint ALJs because that is one of the "functions and duties" of the office she was fulfilling in her capacity as Acting Commissioner of Social Security.

In addition, the cases cited by Claimant are unhelpful to his argument. Claimant quotes *United States v. Eaton*, 169 U.S. 331, 334 (1898): "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official." (Doc. 13 at 10 n.8.) *Eaton* addressed the appointment of a Vice Consul to Siam who was appointed by the Consul to Siam to perform the duties of the Consul when the Consul became too ill to fulfill his duties and returned to the United States. 169 U.S. at 332-33. *Eaton* did not address the duties that a temporarily-appointed inferior officer could perform. Rather, the case only addressed the time that a Vice Consul performed the duties of Consul, rather than the nature of the duties they were allowed to perform.

> Although section 2 of article 2 of the constitution requires consuls to be appointed by the president 'by and with the advice and consent of the senate,' the word 'consul' therein does not embrace a subordinate and temporary officer like that of vice consul, as defined in the statute. The appointment of such an officer is within the grant of power expressed in the same section, saying: 'But the congress may by law vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law or in the heads of departments.' Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered. The manifest purpose of congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice consuls, and thereby to

deprive them of the character of 'consuls,' in the broader and more permanent sense of that word.

*Id.* at 343. Therefore, nothing in *Eaton* prevented Ms. Berryhill from performing all the duties of the Commissioner while acting in that capacity. *Eaton* states that during the time the Vice Consul served as Consul, he was "charged with the performance of the duty of the superior," just as Ms. Berryhill was so charged in this case. Furthermore, the *Eaton* Court reasoned that the rule allowing for the appointment of a Vice Consul under the circumstances presented in the case served the public interest and prevented closure of the consular office. *Id.* at 342-43. Similar goals are served here. If Ms. Berryhill was not authorized to ratify the appointments of sitting ALJs after *Lucia*, and her replacement was not yet nominated by the President and approved by the Senate, "evil consequences" would result. *Id.* at 342. All the work of the SSA would effectively be open to Appointments Clause challenges. This is an absurd result.

Likewise, *Morrison v. Olson*, 487 U.S. 654 (1988) is not on point. *Morrison* addressed whether the independent counsel provisions of the Ethics in Government Act violated the Appointments Clause. 487 U.S. at 659-60. The Court held that special counsel were "'inferior officers' in the constitutional sense" due to the fact that the role is "restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Id.* at 671-72. The Court recognized that special counsel were given full power and independent authority "to exercise all investigative and prosecutorial functions and powers of the Department of Justice," but only within the scope of the jurisdiction granted and not with the power to formulate policy. *Id.* In the case at bar, Claimant proffers no evidence indicating that Ms. Berryhill's authority was so limited during her tenure as

Acting Commissioner.  Rather, it appears that Ms. Berryhill was fulfilling all the duties of the Commissioner while in that role.[11]

Claimant also cites *NLRB v. SW Gen., Inc.*, where Justice Thomas wrote separately "to explain [his] view that the Appointments Clause likely prohibited [NLRB's general Counsel's] appointment." 137 S. Ct. 929, 945 (2017) (Thomas, J., concurring). However, the portion of the concurrence quoted by Claimant addresses an issue the majority did not address and is not binding.  *Id.* at 946 ("The dissent's conclusion that the FVRA authorized the appointment in this case . . . implicates an important constitutional question that the Court's interpretation does not: Whether directing Lafe

_____

[11] Ms. Berryhill actually held the title of Acting Commissioner of Social Security twice.  She first assumed the role on January 21, 2017.  Mar. 6, 2018 letter from GAO Gen. Counsel Thomas H. Armstrong to Pres. Trump, https://www.gao.gov/assets/700/690502.pdf.  On March 6, 2018, the GAO determined that her term should have ended on November 17, 2017 in accordance with the FVRA.  *Id.*  Immediately following the GAO's notification in March 2018, Ms. Berryhill "stepped down from her role as Acting Commissioner and continued to lead the agency from her Deputy Commissioner of Operations position of record. . . . . [H]owever, on April 17, 2018, the President nominated Mr. Andrew Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of Mr. Saul's nomination." *Patterson v. Berryhill*, No. 2:18-CV-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (citing 5 U.S.C. § 3346(a)(2) (providing that, once a first or second nomination for the office is submitted to the Senate, an acting officer may serve from the date of such nomination for the period the nomination is pending in the Senate)) (internal citations omitted).  As discussed above, it is my view that Ms. Berryhill had the power to fulfill all the duties of the Commissioner while holding that title.  To the extent Claimant is pursuing some sort of "lapse or gap in authority" argument for the time Ms. Berryhill led the agency as Deputy Commissioner of Operations even though the act he takes issue with in this case was performed when Ms. Berryhill had the title of Acting Commissioner, I find that Ms. Berryhill had full authority to carry out all the Commissioner's duties at that time, too.  *See* Providing an Order of Succession Within the Social Security Administration*, 81 FR 96337, 2016 WL 7487744 ("[T]he following officials of the Social Security Administration, in the order listed, shall act as and perform the functions and duties of the office of the Commissioner of Social Security (Commissioner), during any period in which both the Commissioner and Deputy Commissioner of Social Security have died, resigned, or become otherwise unable to perform the functions and duties of the office of Commissioner").

Solomon to serve as acting general counsel of the National Labor Relations Board . . .without the advice and consent of the Senate, complied with the Constitution. I write separately to explain my view that the Appointments Clause likely prohibited Solomon's appointment.").

None of the cases cited by Claimant addressed challenges to the appointments of inferior officers by temporarily-appointed officers.[12]  Therefore, Claimant's arguments do not convince me that this case requires remand based on Ms. Berryhill's status at the time she reappointed ALJ Andrews.[13]  Furthermore, the recent decision in *Griffin v. Comm'r of Soc. Sec.* addresses the Third Circuit's decision in *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020), and provides additional reasons why remand in a case such as this without Eighth Circuit mandate to do so, creates bad precedent.  No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL 428950 (M.D. Fla. Jan. 28, 2020), the district court . . . . stated that "[t]he Supreme Court in *Lucia* did not make a blanket finding that all ALJs are subject to the Appointments Clause, just that SEC ALJs are so subject." *Id.* The district court points out that, "[a]t the time the Supreme Court decided *Lucia*, the SEC had only five ALJs. . . . In contrast, there are currently over 1,700 Social Security Administration ALJs." *Id.* The district court also notes that "[t]he Social Security Administration annually receives about 2.6 million initial disability claims and completes about 689,500 ALJ hearings; in 2018, it took an average 809 days to process a claim from its initial receipt to an ALJ decision, with more than 850,000 people waiting for ALJ hearings." *Id.* The district court concluded that "[i]f courts were

---

[12] This lack of on-point precedent makes Claimant's challenge to the Commissioner ring hollow: "If the agency has some historical precedent for an inferior officer constitutionally appointing other inferior officers, the Commissioner should have shared such precedent with the Court." (Doc. 16 at 3-4.)

[13]  I am not sure what Claimant would have had Ms. Berryhill do other than re-appoint the SSA ALJs with *Lucia* as precedent and no permanent successor ready to take office.

to apply *Lucia* to Social Security cases as Plaintiff argues this [c]ourt should, millions of cases would need [to] be remanded for rehearing by a different ALJ. Given these important efficiency concerns and the Supreme Court's specific findings in *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social Security Administration ALJs." *Id.* (quoting *Miaolino v. Comm'r of Soc. Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1, 2019)).

*Id.* at *10 (all alterations except first set of brackets in original).

Finally, Claimant argues that SSR 19-1p, which was issued on March 15, 2019 and which authorizes cases to be heard by new ALJs upon request if Appointments Clause challenges are raised during the administrative process, "constitutes an admission that SSA ALJs are inferior officers that had been improperly appointed before July of 2018." (Doc. 13 at 8.) Although SSR 19-1p recognized the potential impact of the *Lucia* decision, it contains no "admission" and I decline to impute one into the document.[14] Given the flood of litigation surrounding this issue, it is not surprising that SSA would promulgate a rule to ensure uniform handling of cases across the country. I will speculate no further on the motives surrounding the promulgation of SSR 19-1p.

Based on the above discussion, I find that ALJ Andrews was properly appointed. I find that the case need not be remanded based on this issue.

---

[14] In part, SSR 19-1p provides the following:
> We interpret some challenges to the ALJ's authority to hear and decide a claim, based on the Supreme Court's decision in *Lucia*, as raising "a broad policy or procedural issue that may affect the general public interest" within the meaning of our regulations. Challenges to an ALJ's authority to decide a claim may raise a broadly applicable procedural issue independent of the merits of the individual claim for benefits—that is, whether the ALJ who presided over the claimant's hearing was properly appointed under the Appointments Clause of the Constitution.

SSR 19-1p.

# IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ and **dismiss the case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 29th day of May, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

32